THOMAS H. COBBS v. JOYCE-WATKINS COMPANY, P. R. WALSH TIE & TIMBER COMPANY et al., Appellants, and McCAULL-DRYER TIE COMPANY, Respondent.

Division Two, March 19, 1921.

1. **FREIGHT RATES: Overcharges: As Between Agent and Consignee.** Where the purchaser bore the burden of transportation and paid all the freight charges on railroad ties bought by his agent on commission, as between them he, and not such agent, is entitled to all overcharges made by the railroad.

2. ————: ————: **As Between Vendor and Purchaser.** Where the price of the railroad ties to the vendors was the price at the station of destination less the freight charges from the loading station to said destination, and the vendors were paid that price, the freight charges being paid by the consignee, such vendors are not entitled to recover the excess in the overcharge of freight rates made by the railroad.

3. ————: ————: ————: **F. O. B. Destination.** The term "f. o. b. St. Louis," if used at all in the contract for the sale of railroad ties in this case, was not used in its ordinary commercial sense; but the uniform manner of delivery, inspection, acceptance and payment of the purchase price, the assumption of the trouble and expense, by the agent of the purchaser, of ordering cars, loading the ties and paying the freight, and the fact that the vendors had no further interest or concern in the ties or their transportation after they were placed in the loading station yard, inspected and accepted, rebut the implication that the term "f. o. b. St. Louis" was understood as implying that the freight charges should be at the cost of such vendors, and on that term no judgment that they were, as between them and said purchaser, entitled to the excess of the overcharges made by the railroad company can be based.

4. ———: ———: ———: **Bill of Sale: Proof.** Bills of sale, executed by the seller of railroad ties, in which is set forth the name of the buyer, the number of ties sold, the price, the date and number of car by which shipped, and nothing more, while not required by law, the sales and deliveries being complete without them, and the acceptance in payment of drafts from the purchaser which recite that they are given for the purchase price and in settlement of said bills, in the absence of fraud or imposition, characterize the transaction, and furnish indubitable proof that the sellers were not chargeable with the freight charges, and are not entitled, as between them and the said purchaser, to the excess of overcharges in the freight rates made by the railroad and paid by said purchaser.

5. ———: ———: ———: **Agreed Freight Rate.** Where the seller and purchaser agreed on the price of ties at the station of destination, basing the price on a certain freight rate, if the rate was lower than that rate the seller to have the benefit of it, and if higher he was to stand it, and settlement was made on that basis, the seller is entitled to the excess of overcharges in the freight rate made by the railroad company.

Appeal from St. Louis City Circuit Court.—*Hon. Benjamin J. Klene,* Judge.

AFFIRMED.

*F. W. Bull, Harry A. Frank* and *Arthur S. Lytton* for appellant, Joyce-Watkins Co.

(1) The arrangement with the McCaull-Dryer Tie Company was the same as with the other vendor defendants, and was a contract for the sale of the ties, not delivered f. o. b. St. Louis, and the actual freight charges thereon deducted from the selling price, but a contract, recognized and carried out by the parties, payment made by the Joyce-Watkins Company, that the McCaull-Dryer Tie Company should receive a certain price for the ties at said loading station. (2) The acceptance of the draft in payment of said ties, reciting "in full payment of material named in bill of sale of this date and number" and the written endorsement of the McCaull-Dryer Tie Company on said

draft, created a written contract between said parties, into which was merged any anterior verbal understanding. (3) The acceptance of the drafts by the McCaull-Dryer Tie Company discharged the fund and securities as well as the Joyce-Watkins Company from any and all claim it now asserts. (4) The McCaull-Dryer Tie Company is now estopped by its conduct and the actions of its agent, Dahlberg, from asserting any claim against this fund or the Joyce-Watkins Company. (5) The counsel for respondent admits that the contract with the Walsh Company and McCaull was the identical arrangement as was made with the other defendants.

*E. T. & C. B. Allen* for respondent, P. R. Walsh Tie & Timber Co.

(1) The only person entitled to recover the overcharges is the one who made the contract of affreightment, and from whom their exaction was made. McGrew Coal Co. v. Railroad, 217 S. W. 986; Southern Pacific Co. v. Lumber Co., 245 U. S. 531; State v. Ry. Co., 81 Vt. 46; 3 Michie on Carriers, pp. 1150-51. (2) If it is the intention of the parties that the one is to purchase on his own behalf and sell the goods to the other, the transaction is a contract to sell. Kelly v. Sibley, 137 Fed. 586; Black v. Webb, 20 Ohio 304; Moors v. Kidder, 106 N. Y. 32; Bank v. Logan, 74 N. Y. 568; Simonds v. Wrightman, 36 Ore. 120; 31 Cyc. 1204. (3) The one who directly bore the burden of transportation is the one entitled to the overcharges. Jennison v. Dixon, 133 Minn. 268. (4) The Watkins Company was not the real party in interest, and cannot recover. (5) Whether the Walsh Company was a vendor or an agent is not solely a question of fact; it is also a question of law. (6) The law presumes that a person is acting for himself and not as the agent of another, and unless there is proof either that the agency is a general continuing agency to endure until revoked, or that the agent fills some character from which such a general agency may be presumed, the fact that there has been a sep-

arate former agency for a different or even a similar purpose, does not raise a presumption of agency as to any subsequent transactions. 2 C. J. 920, sec. 648.

*T. L. Philips* and *Arnold Just* for interpleaders.

(1) The parties having used the expression f. o. b. St. Louis in their contracts, the court should give these terms their usual meaning unless good reason to the contrary is shown. Heman Const. Co. v. City, 256 Mo. 339; Liggett v. Levy, 223 Mo. 601; Kansas City v. Pub. Serv. Comm., 210 S. W. 385; 13 C. J. 531. (2) These appellants sold the ties "f. o. b. St. Louis" and bore the burden of transportation, and are in equity and good conscience entitled to the overcharges. Jennison Bros. v. Dixon, 133 Minn. 268.

HIGBEE, P. J.—On March 13, 1909, the P. R. Walsh Tie & Timber Company entered into a contract with the Joyce-Watkins Company by which the Walsh Company undertook to act as exclusive agent for the Watkins Company in purchasing railroad ties in the States of Missouri, Arkansas and Louisiana for a commission of two cents per tie. This contract was to be in force for one year. The Walsh Company bought ties at various points on the line of the St. Louis & San Francisco Railroad in Missouri. The ties were inspected by the Burlington Railroad Company in the field, and by direction of the Watkins Company were billed to the Burlington Railroad Company at St. Louis, where that company received them, and paid the freight charges which were refunded by the Watkins Company when settlement was made for the ties. After the expiration of the year, the Burlington withdrew its inspectors from the field, and established a yard in St. Louis, to which ties were shipped and inspected by the Burlington. The Walsh Company thereafter continued purchasing ties, making its own inspection in the field. Ties were purchased at various points on the line of the

Frisco Railroad from the other interpleaders and billed to the Watkins Company at St. Louis over the Frisco road.

The Frisco Railroad Company had sued out a writ of injunction at St. Louis restraining the state officials from enforcing the maximum freight rates established by Section 3241, Revised Statutes 1909. This was dissolved by the United States Supreme Court on appeal in May 1913. Thereafter, on May 27, 1913, the federal court at St Louis appointed receivers for the Frisco Railroad Company. Straightway the Watkins Company filed a claim in said court for alleged overcharges exacted by the Frisco Railroad for carrying the ties above mentioned, specifying the cars, dates of shipment and the excess charges paid on each car. The Walsh Company and all of the other interpleaders, except Hughes and Weatherford, filed similar claims. These claims were adjusted, so that on October 5, 1917, there was paid to the plaintiff, as trustee for all claimants, cash and interest bearing securities of the face value of $99,418.32. On November 12, 1917, plaintiff filed in the circuit court of the city of St. Louis, a petition in the nature of a bill of interpleader against all of the defendants who were severally asserting conflicting claims to all or portions of said funds. These various claims were for overcharges exacted prior to May 27, 1913, the date of the Frisco receivership. Thereupon the above-named defendants filed their separate answers and interpleas, admitting the allegations of the petition and asserting their respective claims in the matter of the overcharges paid to the Frisco Railroad Company. Answers and replies were filed by the several interpleaders. The issues thus framed were submitted by the court to the Honorable Davis Biggs, as referee, who heard the evidence and on March 10, 1919, submitted his report and findings on the evidence taken before him. Exceptions to the report were overruled, the report approved, and judgment rendered in accordance therewith. All of the parties, except the McCaull-Dryer Company, appealed.

I. The referee states the several claims of the interpleaders as follows:

"At the argument and in the briefs of counsel it is conceded by all of the various defendants that the claims f each to the overcharges as set forth in 'Exhibit A' attached to the intervening petition of the Joyce-Watkins Company are as follows:

"1. The Joyce-Watkins Company claims all of said overcharges, to-wit, $111,941.35.

"2. All of the defendants concede that of the said overcharges the Joyce-Watkins Company is entitled to the sum of $22,093.58.

"3. As against the Joyce-Watkins Company the Walsh Company claims the sum of $86,776.12.

"But of this sum and as against the other defendants, Johnson et al., the Walsh Company only claims the sum of $40,388.24, conceding that between it and the defendants, Johnson et al, each of said defendants is entitled to the amount claimed by them, respectively, which claims of the other defendants are as follows:

| | |
|---|---:|
| "Schneider Brothers | $ 478.88 |
| McCaull-Dryer Tie Company | 452.70 |
| Hughes | 3,141.60 |
| Angerer | 9,087.83 |
| Weatherford | 2,675.56 |
| Abeles | 4,852.86 |
| Johnson | 26,696.56 |
| Fisher Brothers | 2,076.33 |

"The Walsh Company makes no claim to any overcharges on cars shipped prior to June 15, 1910, the time that the defendant Joyce-Watkins Company established a tie yard in the City of St. Louis, which shipments aggregate the sum of $25,166.02."

Walsh, the president of the Walsh Company, had been buying ties for the Watkins Company since some time in the year 1908. On March 13, 1909, the Walsh Company, as first party, and the Watkins Company, as second party, entered into a written contract which contains the following provisions:

Overcharges: As Between Agent and Consignee.

"The first party, without expense to the second par-
ty, is to act and will use its best endeavors as the exclusive
agent of the second party in the states of Missouri, Ar-
kansas, Oklahoma and Louisiana, for the purchase of all
kinds of railroad ties.

"Second party is to pay first party a commission of
2c on each railroad tie which the first party shall buy for
the second party in any of the said four states at a price
and on terms which shall be statisfactory to the second
party."

Walsh purchased ties from the other interpleaders at
points along the line of the Frisco Railroad. Walsh and
the defendants from whom he bought ties testified that he
purchased them f. o. b. St. Louis, on the basis of the St
Louis price. Walsh deducted from this price the
freight from the loading stations to St. Louis, sometimes
giving the sellers a check drawn by the Walsh Com-
pany on its own funds, but generally giving a draft
on the Joyce-Watkins Company for the difference
between the St. Louis price and the freight rates
as charged by the railroad company. At first some of the
sellers waited until the freight bills were returned before
the settlement was made. Finally, to save delay, it was
agreed that the average weight of the ties was 150 pounds
each, and the freight was reckoned on that basis. Set-
tlement was then made accordingly by draft as aforesaid.
Usually a bill of sale was made by the seller of the ties,
of which the following is a sample:

"Date Sept. 22nd, 1910.          ·          No. 17516.

"The undersigned hereby sells to Joyce-Watkins Co.,
of Chicago, Ill., the following described material, cer-
tifying that the same is free from all liens and encum-
brances of any character:

"Located at Anaconda, Mo.
· "1185 No. 1 R. O. ties at 33½c..........$396.97
"180 No. 2 R. O. ties at 16¾c............30.15

1365                              427.12

"Frisco 82215 1/431, 2/69
"Frisco 82669 1/392, 2/73
"Frisco 49762 1/362, 2/38

"J. W. JOHNSON, Vendor."

The Walsh Company, as stated, makes no claim for the overcharges exacted prior to June 15, 1910, admitting that it was acting as purchasing agent during that period. It claims, however, that on the expiration of the contract of March 15, 1909, it made a new verbal contract with the Watkins Company which was put in writing on June 27, 1913, a month after the appointment of the receivers, and that under that contract the Walsh Company ceased to act as agent for the Watkins Company and expressly bound itself to pay all freight charges on ties it thereafter purchased for and shipped to the Watkins Company, and that the Walsh Company is, therefore, entitled to the overcharges paid after June 15, 1910, when the tie yard was established in St. Louis. The referee found that issue against the Walsh Company.

There was conflicting evidence on this point. Frank W. Werner, secretary of the Watkins Company, and A. R. Joyce, assistant secretary and assistant treasurer thereof, testified that there was no new contract entered into with the Walsh Company, and that Walsh continued to buy ties as agent for the Watkins Company on a commission of two cents per tie. The change in their method of conducting business was that after June 15, 1910, the Burlington inspectors were withdrawn from the field, Walsh inspected the ties, drew drafts on the Watkins Company for the cost of the ties at the loading points, paid the freight to the Railroad Company by drawing drafts on the Watkins Company therefor, and the commissions were settled monthly. The books of the Walsh Company, which were introduced, showed that it continued during the whole period to charge the Watkins Company with commissions at two cents per tie, which were settled monthly.

The testimony of Walsh, taken at the former hearing, was read in evidence. We quote from that as follows:

"Q.   How long did you continue to operate under that contract?   A.   One year.

"Q.   At the end of one year what then happened? A.   Well, we continued doing business right along practically on the same method."

We think the referee was clearly warranted in finding that the Walsh Company bought the ties as agent for the Watkins Company after, as well as before, the expiration of the contract of March 13, 1909, and that it paid all the freight charges on the ties bought by the Walsh Company prior to May 27, 1913.

It was admitted by Walsh before the referee that the Watkins Company was entitled to all overcharges on ties purchased by the Walsh Company as its agent. The Watkins Company paid all the freight charged by the Frisco Railroad. It was, in fact, both consignor and consignee. It bore the burden of the transportation and, as against the Walsh Company, is clearly entitled to recover the overcharges.

In Jennison Brothers v. Dixon, 133 Minn. 268, the facts were: Dixon, a merchant at St. Charles, at various times bought flour and feed from the plaintiff in carload lots at Janesville, to be delivered by plaintiff at St. Charles, at an agreed price per barrel for flour and per ton for feed.   Defendant paid the freight bills and was credited therefor on the purchase price.   It developed that the freight charges were in excess of the legal rates.   The excess was refunded by the railroad to the defendant. Plaintiff sued to recover the money so refunded.   It was held that, as plaintiff had borne the excess of such transportation, he was entitled to recover, citing State v. Central Vermont Ry. Co., 81 Vt. 459, 71 Atl. 193, 21 L. R. A. (N. S.) and other cases.

This question was considered by this court in McGrew Coal Co. v. Mo. Pac. Ry. Co., 280 Mo. 466.   In that case plaintiff had quoted to its customer a price for coal f. o. b. destination.   The coal was shipped by plaintiff from Myrick to Blackwater, points on defendant's railroad.   The court said, at page 475:

"The stipulation stated that the plaintiff, instead of quoting to his customer a price for the coal f. o. b. at Myrick, quoted a price delivered at its destination. This means that the coal was sold to the consignee f. o. b. at the station of destination. When the coal was delivered the purchaser paid the illegal freight bill and settled his account with the plaintiff by sending him the defendant's receipt for the amount of freight paid, with the balance in cash. The transaction of sale stated in the stipulation was a simple one. According to its terms the less the purchaser of the coal paid for freight the more the plaintiff received in net proceeds from the transaction. The more he paid for freight the less the plaintiff received for his coal.

"The stipulation states that plaintiff's quotation to the purchaser 'was based upon the price at Myrick, plus the freight rate charged by the defendant.' This is probably true. The value of all commodities is based on all the conditions of cost, including transportation. When the consignee of this coal sold some or all of it to his customer, he no doubt based the price upon the cost of the coal in his yard, including the illegal charge paid to the defendant, but this would not transfer the right to bring the suit for the overcharge. We cannot see that the plaintiff stands on any different footing from that upon which it would stand had it paid the freight in advance. While it would, no doubt, then take it into consideration as an element in the selling price of his commodity, that fact would have no effect upon the liability of defendant for the illegal exaction.

"This litigation illustrates the just and salutary operation of the rule. The defendant had the physical power to enforce its illegal claim by withholding the delivery. The right of each consumer upon whom the burden ultimately falls to pursue the tortuous course of litigation which has resulted from these transactions would be a barren one. The remedy, to be effective, must lie with the shipper with whom the contract is made, and the amount of the recovery measured by the amount which

he is, either directly or through his consignee, forced to pay. This conclusion is well supported by the authorities. [Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U. S. 531, 38 Sup. Ct. 186, 62 L. Ed. 451, 221 Fed. 890, 137 C. C. A. 460; Burgess v. Freight Bureau, 13 Interest. Com. Comn. R. 668, 680; Jennison v. Dixon, 133 Minn. 268, 158 N. W. 398.]''

II. We come now to the consideration of the claims of the other defendants (except that of the McCaull-Dryer Co). Their testimony and that of Walsh was that the ties were sold on the basis of the St. Louis prices, f. o. b. St. Louis. As previously stated, some of these defendants preferred to wait until the freight bills were returned, when the representative of the Walsh Company deducted the freight from the St. Louis price and paid the seller the difference. To avoid the delay incident to this course of dealing, by mutual consent, they adopted the plan of reckoning the freight on the basis of 150 pounds per tie, which all agreed was the average weight. On each delivery of ties at the loading stations the freight was accordingly deducted from the St. Louis price and the difference paid to the seller, as the price of the ties, by drafts, as heretofore stated. Usually, but not always, each of the defendants at the time signed a bill of sale to the Watkins Company for the ties so delivered. They were then loaded by representatives of the Walsh Company at its expense and consigned in the name of that company to destination. This method, we think, was adopted to fix the price of the ties at the loading stations. We quote from the testimony of one of the defendants:

"Q. Mr. Angerer, you stated that this price that Walsh gave you was the St. Clair price: what did you mean by that? A. Well, my price, to arrive at a St. Clair price we took the St. Louis price on the ties and then took the freight rate from St. Clair on the basis of a hundred and fifty pounds to the tie and deducted it. That left us the St. Clair price.''

*Overcharges: As Between Vendor and Consignee.*

The defendants took their money and had no further interest or concern about the ties. They were in no sense shippers. They did not load nor incur any of the trouble or expense of loading, nor assume the obligation or relation of consignors. If the ties had been lost or destroyed in transit, would the loss have fallen on them? Had either of them the right of stoppage *in transitu*? If the freight paid had proven to have been less than the legal rate, would these defendants have been liable in an action by the carriers to recover the undercharge? [Mobile and Ohio Railroad Co. v. Laclede Lumber Co., 216 S. W. 798.] Under the undisputed testimony the referee was right in holding that the title passed to and vested in the Watkins Company at the time of each delivery and settlement at the loading stations. The delivery was complete, the purchase price was paid, the contract was executed.

III. It is, however, contended that the contract of sale, in its inception, was made on the basis of the St. Louis price f. o. b. St. Louis, and that this term of the contract is determinative of the issue. If that **F. O. B. Destination.** be true, then it follows that the ties while in transit were at the risk of these defendants.

We think that the course of dealing shows that these words were not intended to be used, if they were used at all, in their ordinary commercial sense. The uniform manner of delivery, inspection, acceptance and payment of the purchase price, the assumption of the trouble and expense by the Walsh Company, as agent of the Watkins Company, of ordering cars, loading ties, payment of freight, and the fact that these defendants had no further interest or concern in the matter, rebut the implication that the words "f. o. b. St. Louis" were understood as implying that the freight charges should be at the cost of the sellers of the ties. [United States v. Andrews, 207 U. S. 229-241.]

But the stubborn fact remains that on the delivery of the ties the seller, not always, as claimed by the Watkins Company, but usually, executed a bill of sale to

that company, reciting the price paid and specifically de-
scribing the ties sold and delivered. The drafts also re-
cited that they were given for the purchase price.

While these sale bills were not required by law and
the sales and deliveries were complete without them, still
they cannot be brushed aside as merely intended to
identify the particular ties delivered, as contend-
Bills of Sale. ed by counsel. In the absence of fraud or imposi-
tion they definitely and conclusively characterize
the transactions. They furnish indubitable proofs of the
execution of the contracts according to their terms. Judge
LAMM well said: "When men sit down to put a contract
in writing and do so the presumption is they write all
there is of it. All prior or contemporaneous verbal con-
versations relating to the subject-matter are merged in
in the writing." [Beheret v. Myers, 240 Mo. 58, l. c.
75.] Further citations on a proposition so elemental
would be mere affectation of learning.

IV. There is no merit in the objection that the bills
of sale do not specify either time or place of delivery.
They bear witness to executed, not executory, contracts.
The sales and deliveries were accomplished. We quote
from the report of the referee:

"In those instances where the defendants did not ac-
cept drafts and execute bills of sale, they nevertheless
delivered the ties to the Walsh Company at the loading
stations and gave up their title there. The legal effect
of such method of business was to make these transactions
sales at the loading stations, and not even f. o. b. cars
at the loading stations, at the St. Louis price at the then
rate of freight charged by the railroad, estimating each
tie to weigh 150 pounds.

"This cannot be said, however, of defendant McCaull
Company. Mr. McCaull testified that he and Walsh agreed
on a price for the ties at St. Louis, basing it on an
8½ cent freight rate; that if the rate was lower than
8½ cents he was to have the benefit thereof; if it was over
he would have to stand for it. It is undisputed that the

method of carrying on the business with the McCaull Company was different than with the other defendants, in this, that the McCaull Company always rendered invoices to the Walsh Company for the St. Louis price, less the freight charges, after the ties were shipped. The Walsh Company would pay such invoices by mailing the McCaull Company a draft on Joyce-Watkins Company."

The conclusion of the referee is that the McCaull-Dryer Company was entitled to judgment for the overcharges exacted on the shipment of the ties sold by it. Walsh, as agent of the Joyce-Watkins Company, contracted with McCaull. In legal effect, that company and McCaull mutually agreed on a price for the ties at St. Louis, basing it on an 8½ cent freight rate; if the rate was higher, McCaull would "stand for it," if it was lower, "McCaull was to have the benefit thereof." The contract was mutually obligatory.

It therefore results that the judgment of the circuit court should be and is affirmed. All concur.